## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re:<br>TOUSA, INC., *et. al.*,<br><br>            Debtors.<br>_____<br><br>CITICORP NORTH AMERICA, INC., *et al.*,<br><br>            Appellants,<br><br>v.<br><br>OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS, *et al.*,<br><br>            Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.: 0:10-cv-60019<br>   Honorable Judge Adalberto<br>   Jordan |

### BRIEF OF *AMICUS CURIAE* COMMERCIAL FINANCE ASSOCIATION IN SUPPORT OF FIRST LIEN APPELLANTS AND FOR REVERSAL

Charles M. Tatelbaum (FL Bar No. 177540)
Adorno & Yoss LLP
350 East Las Olas Blvd.
Suite 1700
Ft. Lauderdale, FL 33301
(954) 766-7820
(866) 621-4198 (facsimile)

Richard M. Kohn (IL Bar No. 1501070)
William C. Meyers (IL Bar No. 6195666)
Nury R. Agudo (IL Bar No. 6298956)
Goldberg Kohn Ltd.
55 E. Monroe Street
Suite 3300
Chicago, IL 60603
(312) 201-4000
(312) 332-2196 (facsimile)
(Pro Hac Vice Admission)

Jonathan N. Helfat (NY Bar No. JH (9484))
James M. Cretella (NY Bar No. JC (6978))
Otterbourg, Steindler, Houston, &
    Rosen, P.C.
230 Park Avenue
New York, NY 10169
(212) 661-9100
(212) 682-6104 (facsimile)

August 5, 2010
Co-Counsel for *Amicus Curiae* Commercial Finance Association

## Corporate Disclosure Statement

Amicus curiae, the Commercial Finance Association, states that it is a nongovernmental corporate entity that does not have a parent corporation and does not issue stock.

## Table of Contents

Page

Rule 26.1 Corporate Disclosure Statement .................................................................................. ii

Table of Contents ........................................................................................................................ iii

Table of Authorities .................................................................................................................... iv

Statement of Identity, Interest and Authority of Amicus Curiae ................................................. 1

Introduction .................................................................................................................................. 2

Argument ...................................................................................................................................... 4

I.    The Bankruptcy Court's Invalidation of the Savings Clauses Will Adversely Impact
      the Availability and Cost of Credit for Businesses ............................................................. 4

II.   The Bankruptcy Court's Reasons for Striking Down the Savings Clauses Were
      Fundamentally Flawed ........................................................................................................ 5

      A.    Savings Clauses Ensure Compliance with § 548 of the Bankruptcy Code .................. 6

      B.    Savings Clauses Do Not Violate §541(c)(1)(B) Because They Increase The
            Assets in the Debtor's Estate .................................................................................... 9

      C.    The Savings Clauses are Not Inherently Indeterminate ............................................ 10

      D.    The Savings Clauses Automatically Amended the Conveying Subsidiaries'
            Obligations and No Written Modification Was Necessary ........................................ 11

III.  Similar Savings Clauses Are Routinely Enforced .............................................................. 11

Conclusion .................................................................................................................................. 16

## Table of Authorities

*Cases*

*Anders v. Hometown Mortgage Serv.,*
    346 F.3d 1024 (11th Cir. 2003) ............................................................................. 13

*Bank of America, N.A. v. Carpenter,*
    -- N.E.2d --, 2010 WL 2079651 (Ill. App. 1st Dist. May 24, 2010) ..................... 14

*Caban v. J.P. Morgan Chase Co.,*
    606 F. Supp. 2d 1361 (S.D. Fla. 2009) ................................................................. 13

*Cattail Assocs. Inc. v. Sass,*
    170 Md. App. 474, 907 A.2d 828 (Md. App. 2006) ............................................. 14

*Dallman v. Ritter,*
    225 P.3d 610 (Colo. 2010) ..................................................................................... 15

*FDIC v. Claycomb,*
    945 F.2d 853 (5th Cir. 1991) ................................................................................ 12

*First Wisconsin Financial Corp. v. Yamaguchi,*
    812 F.2d 370 (7th Cir. 1987) .................................................................................. 4

*G & K Servs., Inc. v. Ambler,*
    No. 07-601, 2007 WL 712290 (E.D. Pa. Mar. 6, 2007) ................................. 14, 15

*In re Dominguez,*
    995 F.2d 883 (9th Cir. 1993) ................................................................................ 12

*In re Hawley,*
    No. 02-83674, 2004 WL 330098 (Bankr. C.D. Ill. Feb. 20, 2004) ....................... 14

*In re Matter of King,*
    545 F.2d 700 (10th Cir. 1976) ........................................................................ 12, 13

*In re Perry,*
    425 B.R. 323 (Bankr. S.D. Tex. 2010) ................................................................. 12

*Jersey Palm-Gross, Inc. v. Paper,*
    658 So.2d 531 (Fla.1995) ...................................................................................... 12

*Kegel v. Tilloston,*
    297 S.W.3d 908 (Ky. App. 2009) .......................................................................... 15

*Krstic v. Princess Cruise Lines, Ltd.,*
    No. 09-23946-CIV, 2010 WL 1542083 (S.D. Fla. March 25, 2010) .................... 13

*Lilly v. Citizens Fidelity Bank and Trust Company,*
    859 S.W.2d 666 (Ky App. 1993) .......................................................................... 14

*Ludwig v. AmSouth Bank of Florida,*
    686 So.2d 1373 (Fla. App. 2d Dist. 1997) ........................................................... 14

*People v. Kelly*,
    222 P.3d 186 (Cal. 2010) ...................................................................................... 15

*Smith v. Smith ex rel. Clarke*,
    747 A.2d 85 (Del. Ch. 1999)................................................................................ 14

*Video Trax, Inc. v. NationsBank, N.A.*,
    33 F. Supp. 2d 1041 (S.D. Fla. 1998) ................................................................. 12

*White v. Fleet Bank of Maine*,
    739 A.2d 373 (Me. 1999)..................................................................................... 14

*Zimmer, Inc. v. Sharpe*,
    651 F. Supp. 2d 840 (N.D. Ind. 2009) ................................................................ 15

### Other Authorities

George Triantis, *A Tussle with Tousa: Savings Clauses in Intercorporate Guaranties*, in
    Janis P. Sarra, ed., Annual Review of Insolvency Law 2009 ................................. 3

Norton Bankruptcy Law and Practice 3d, §61:1 ................................................................. 9

Norton Bankruptcy Law and Practice 3d, §61:16.............................................................. 10

### Statement of Identity,
### Interest and Authority of Amicus Curiae

This *amicus curiae* brief is filed by the Commercial Finance Association ("CFA") in support of the appeal of Citicorp North America, Inc. ("CNAI"), in its capacity as Administrative Agent for the First Lien Lenders.[1]

CFA is the principal United States trade association for financial institutions that provide asset-based financing to commercial borrowers. CFA has over 260 members, including substantially all of the major money-center and regional banks in the United States, as well as other independent lenders of all sizes. Financing provided by CFA members and other U.S. asset-based lenders comprises a substantial portion of the United States credit market and currently exceeds $480 billion. CFA members provide financing to businesses on an international, national, regional, and local scale. Most of the companies who receive credit from CFA members depend on this financing for working capital to operate and grow their businesses.

Fraudulent transfer savings clauses provide for an automatic reduction of the obligations incurred and liens granted by an obligor to the extent necessary to prevent the obligor's insolvency. The Bankruptcy Court found, among other things, that the fraudulent transfer savings clauses contained in the First and Second Lien loan documents were unenforceable. Because such fraudulent transfer savings clauses seek to ensure compliance with applicable fraudulent transfer laws, and CFA members, as well as many other lenders, have extended credit to borrowers in reliance upon the enforceability of such clauses, CFA has a strong interest in the outcome of this case. For the reasons discussed below, CFA urges the Court to reverse the decision of the Bankruptcy Court with respect to the savings clauses.

---

[1] Capitalized terms not defined herein are defined in the Opening Brief of First Lien Appellants.

{230053.0001/N0846292_1}1605733.2

## Introduction

A transfer made by an insolvent entity is potentially subject to attack as a fraudulent transfer under Section 548 of the Bankruptcy Code (the "Code") and state fraudulent transfer laws. However, at the time an entity makes a transfer, its solvency is often difficult to determine because solvency is based on estimates of value. Fraudulent transfer savings clauses seek to retroactively reduce an entity's liabilities when previous estimates of such entity's value turn out to be wrong. In other words, if an entity is later determined to have been rendered insolvent by a transaction, fraudulent transfer savings clauses operate to relieve the entity from liability for the portion of the obligation that actually caused the entity to become insolvent while at the same time preserving the entity's liability for the remainder of the obligation (in a sense, it operates as a "true-up" of the transaction).

The Bankruptcy Court ruled that the fraudulent transfer savings clauses contained in the loan documents were wholly unenforceable. This ruling is contrary to the Bankruptcy Code and the historically favorable judicial treatment of similar savings clauses by other courts in a variety of legal contexts. Moreover, the Bankruptcy Court's holding will, unless reversed on appeal, adversely impact the availability and cost of credit for businesses, not only in Florida, but throughout the United States – a result that unfairly penalizes parties that seek in good faith to comply with the provisions of the Code and state fraudulent transfer laws. Indeed, because the credit support offered by guarantees, which typically contain fraudulent transfer savings clauses, will be less reliable, lenders will be compelled to either charge more to lend money, or to reduce the amount of loans they make, in an effort to compensate for the additional risk. Alternatively, they may forbear from lending altogether, in certain situations.

CFA is mindful that the Bankruptcy Court's finding with respect to the enforceability of the saving clauses may constitute *dictum*.[2] Nevertheless, the decision has already been well publicized for its sweeping rejection of fraudulent transfer savings clauses as "frontal assault[s]" on the Bankruptcy Code. Consequently, CFA is concerned that such strong findings, *dictum* or not, if allowed to stand, could lead to widespread challenges to the enforceability of savings clauses or, even worse, be mistakenly interpreted by some courts as the holding of this case.[3] Moreover, if the Bankruptcy Court's finding that the Conveying Subsidiaries were insolvent prior to the transaction is reversed on appeal, such reversal will clearly turn the Bankruptcy Court's findings regarding the savings clause into appealable questions of law.

For all of these reasons, CFA respectfully requests that this Court reverse the decision of the Bankruptcy Court with respect to the fraudulent transfer savings clauses.

---

[2] The effect of a savings clause is to prevent a transaction from rendering an otherwise solvent entity insolvent. Thus, the savings clause has no effect when an entity is already insolvent at the time of the allegedly fraudulent transfer. Because the Bankruptcy Court found that the Conveying Subsidiaries were already insolvent at the time of the allegedly fraudulent transfers, the Bankruptcy Court's finding with regard to the savings clauses was unnecessary and therefore *dictum*.

[3] Indeed, at least one commentator has noted that some of the Bankruptcy Court's "reasons for striking down the savings clause apply beyond the facts of this case, and consequently have raised significant concern in the legal and financial community. For example, Sherman & Sterling's Client Publication issued on November 2, 2009, observed that the Court's 'most notable holding was its unqualified rejection and invalidation of so-called 'savings clauses' in upstream guarantees ... [U]nless the decision is reversed on appeal, it is sure to open the floodgates to litigation against lenders who receive guarantees predicated upon savings clauses.'" See George Triantis, *A Tussle with Tousa: Savings Clauses in Intercorporate Guaranties*, in Janis P. Sarra, ed., Annual Review of Insolvency Law 2009 at 1-2.

## Argument

I.  **The Bankruptcy Court's Invalidation of the Savings Clauses Will Adversely Impact the Availability and Cost of Credit for Businesses**

There is a strong correlation between the availability and cost of any given loan and the lender's evaluation of the risk of non-payment of that loan. If a lender perceives increased risks in recouping its money, the lender may decide not to extend credit, to extend less credit, or to extend credit at a higher interest rate. One of the significant ways in which lenders address the risk of non-payment, and thereby keep the cost of credit as low as possible for the borrower, is by obtaining credit support from affiliates of the borrower, either as co-borrowers (as in the case at hand) or as guarantors.[4]

In reliance upon the guarantees of qualified guarantors, lenders often are willing to extend credit to companies that otherwise might not have access to it, to increase the amount of credit otherwise available to companies, or to extend credit at a lower interest rate. Because guarantees are critically important to commercial finance transactions as a form of third-party credit support, anything that impairs their value or utility necessarily will have an adverse impact on the availability and cost of credit and, thus, on the financing of businesses and ventures. As the Seventh Circuit explained in *First Wisconsin Financial Corp. v. Yamaguchi*:

> Clarity is important to commercial transactions. The beneficiary of a guaranty relies on the undertaking in supplying credit. Unless the lender can determine the extent of its protection through objective criteria, the risk of doing business will go up, and with it the rate of interest charged for loans. Uncertainty thus injures honest, reliable debtors. 812 F.2d 370, 373 (7th Cir. 1987).

---

[4] For convenience of reference, and because co-borrowing arrangements and guarantees play similar roles as additional credit support in loan transactions, the term "guarantee" will be used to describe both forms of obligation, and the term "guarantor" will be used to describe co-borrowers and guarantors.

The Bankruptcy Court's wholesale invalidation of savings clauses seriously impairs the value and utility of guarantees by increasing the risk that a guarantee will be avoided as a fraudulent transfer should the guarantor become subject to a bankruptcy case. To compensate for this additional risk that essential credit support for loans they make may evaporate, lenders will either charge more to lend money, reduce the amount of loans they make, or forbear from lending altogether. Thus, the Bankruptcy Court's ruling that savings clauses are *per se* unenforceable will adversely impact the cost and availability of credit, not only in Florida but throughout the United States. Consequently, CFA respectfully requests that this Court reverse the decision of the Bankruptcy Court as it relates to the savings clauses.

## II.     The Bankruptcy Court's Reasons for Striking Down the Savings Clauses Were Fundamentally Flawed

The fraudulent transfer savings clause set forth in the First and Second Lien Term Loan documents provided as follows:

> Each Borrower agrees if such Borrower's joint and several liability hereunder, or if any Liens securing such joint and several liability, would, but for the application of this sentence, be unenforceable under applicable law, such joint and several liability and each such Lien shall be valid and enforceable to the maximum extent that would not cause such joint and several liability or such Lien to be unenforceable under applicable law, and such joint and several liability and such Lien shall be deemed to have been automatically amended accordingly at all relevant times.

(Amended Findings of Facts and Conclusions of Law, entered on October 30, 2009, in Case No. 08-01435-JKO, docket entry 722 ("Findings" p.139, fn.49)). In the context of the law applicable to fraudulent transfers, the affect of the savings clauses is to allow the obligations incurred, and the liens granted, by the Conveying Subsidiaries to be enforceable to the extent that they would not cause the Conveying Subsidiaries to fail any of the financial tests contained in §548 of the Bankruptcy Code or applicable state fraudulent transfer law (discussed below).

The Bankruptcy Court declared that these clauses were unenforceable on the grounds that they were: (a) a frontal assault on §548 of the Bankruptcy Code; (b) conditioned upon the insolvency of the debtor and thus violative of §541(c)(1)(B) of the Bankruptcy Code; (c) inherently indeterminate and thus unenforceable; and (d) not properly documented.   CFA respectfully submits that the Bankruptcy Court's reasoning was seriously flawed with respect to each of these conclusions.

A.    **Savings Clauses Ensure Compliance with § 548 of the Bankruptcy Code[5]**

Subsections 548(a)(1)(B)(i) and (ii)(I)-(III) of the Bankruptcy Code provide for the avoidance of obligations and transfers by insolvent entities that receive less than reasonably equivalent value in exchange for such obligations and transfers, that are left with unreasonably small capital or that are rendered unable to pay their debts as they mature.   Finding that the savings clauses were "a frontal assault on the protections which §548 provides to other creditors," the Bankruptcy Court concluded that the savings clauses were unenforceable. Findings, p. 140-41.   The Bankruptcy Court, however, ignored the fundamental nature and goal of these savings clauses.

Fraudulent conveyance savings clauses evolved from the substantial precedent of savings clauses in other commercial contexts[6] as a tool by which lenders could more accurately comply with the complex requirements of §548 of the Bankruptcy Code and state fraudulent transfer laws. The clauses, which have been relied upon by lenders for decades, provide for an

---

[5] As the Bankruptcy Court noted, under the facts of this case, there are no material differences between the financial tests contained in §548 of the Code and those contained in the applicable state fraudulent transfer laws. See Findings, p. 129, fn. 47. Thus, for the sake of brevity the following discussion will be confined to the tests contained in §548 of the Code.

[6] See Discussion at Section III, below.

automatic reduction in the amount of the guarantee to the extent necessary to prevent the guarantee from rendering the guarantor insolvent, or otherwise rendering the guarantee unenforceable under state or federal insolvency law.

Nothing in the Bankruptcy Code precludes a company from guaranteeing the debts of its affiliates so long as doing so would not violate any of the three financial tests prescribed by §548(a)(1)(B)(ii) of the Code (the "Insolvency Tests"). In essence, these tests are:

1. The guarantee must not cause the sum of guarantor's debts to exceed the fair value of its assets;
2. The guarantee must not leave the guarantor with unreasonably small capital; and
3. The guarantee must not leave the guarantor unable to pay its debts as they mature.

The challenge for lenders and borrowers alike in structuring a given loan, particularly a loan to a corporate group comprised of a parent corporation and subsidiary corporations, is to obtain sufficient credit support in the form of guarantees to enable the lender to extend enough credit for the group's needs, and on the best possible terms, without violating any of the Insolvency Tests.

However, complying with the Insolvency Tests is not an exact science. For instance, the insolvency component of the Insolvency Tests (the test described in clause 1. above and set forth in §548(a)(1)(B)(ii)(I) of the Code) is not a simple GAAP test reflecting the financial statements of the guarantor. Instead, it is based on the definition of "insolvency" set forth in §101(32) of the Code, which requires that the subject company's assets be restated as "a fair valuation," and that the company's liabilities be restated as prescribed by §§101(12) and 101(5) (definitions of "debt" and "claim", respectively). The tests described in clauses 2. and 3. above (set forth in §§548(a)(1)(B)(ii)(II) and 548(a)(1)(B)(ii)(III) of the Code) are based in large part on the anticipated cash flow of the company, so that compliance with these tests requires the

development of financial projections for the company, which by their very nature involve estimates and assumptions concerning unknown factors.

Prior to the development of fraudulent transfer savings clauses, the penalty for making a good-faith error in calculating the impact of a proposed upstream guarantee on the guarantor's ability to comply with the Insolvency Tests was extreme: the loss of the entire guarantee, and with it all of the collateral securing the guarantee. Fraudulent transfer savings clauses emerged as a response to this situation. The solution offered by these clauses was that, in the event that the execution of an upstream or other guarantee caused the guarantor to fail any of the Insolvency Tests, the lender would voluntarily relinquish that portion of the guarantee necessary to assure compliance with the Insolvency Tests. Such a solution not only benefits lenders by providing them with greater assurance that the required credit support for their loans would be present if and when needed, but it benefits borrowers, and their other creditors as well, by increasing the amount, and improving the terms, of the credit that the borrowers would be able to obtain in order to operate and grow their businesses.

Fraudulent transfer savings clauses address the fact that even the best-intentioned and most careful due diligence may not be sufficiently precise to satisfy the complex Insolvency Tests, especially in light of the fact that compliance with the tests is generally determined years later from the hindsight of a bankruptcy proceeding. In other words, savings clauses allow the lender, the borrower and the guarantor to achieve compliance with §548 where compliance is not necessarily ascertainable at the time of documentation. As fraudulent transfer savings clauses facilitate compliance with §548, rather than "assault" the protections afforded by §548, CFA respectfully submits that the Bankruptcy Court's ruling with respect to the enforceability of the savings clauses should be reversed.

**B.**   **Savings Clauses Do Not Violate §541(c)(1)(B) Because They Increase The Assets in the Debtor's Estate**

Section 541(c)(1)(B) of the Bankruptcy Code prohibits contractual terms, commonly referred to as "*ipso facto*" clauses, that effect a forfeiture, modification, or termination of the debtor's interest in property of its estate as a result of the insolvency or financial condition of the debtor. The Bankruptcy Court concluded that the fraudulent transfer savings clauses in the First and Second Lien Lenders' loans documents constituted unenforceable "*ipso facto*" clauses within the meaning of §541(c)(1)(B). Findings, p. 139-40. However, the Bankruptcy Court's conclusion misconstrues the overarching goal of §541, as well as the specific objectives of subsection 541(c)(1)(B).

The purpose and goal of §541 of the Bankruptcy Code is the creation of the debtor's estate:

> Subsection (a) illustrates the broad reach of Code §541's definition. Estate property includes any of the property identified in subsection (a) "wherever located and by whomever held." Subsection (a)(1) gives content to this by providing that estate property includes all "legal or equitable interests of the debtor in property as of the commencement of the case." The legislative history states that the scope of Code §541(a)(1) "is broad. It includes all kinds of property, including tangible or intangible property, causes of action ... and all other forms of property currently specified in section 70a of the Bankruptcy Act. The legislative history further indicates that Code §541(a)(1) "will bring everything of value that the debtor has into the estate."

Norton Bankruptcy Law and Practice 3d, §61:1 (internal citations omitted). Section 541 is expansive. It seeks to bring in all of the debtor's assets under the jurisdiction of the bankruptcy court. "In short, Code §541's operative scheme may be summarized as follows: 'Any and all property rights of the debtor at the time of the commencement of the case become part of the estate, and remain property of the estate unless specifically removed from the estate." *Id.*

To further the goals of §541(a), subsection 541(c)(1)(B) invalidates contractual provisions that interfere with those goals. "The section can be generally applied so that restrictions in leases, executory contracts, or other assets are ineffective and as such may become property of the estate." Norton Bankruptcy Law and Practice 3d, §61:16. Thus, contractual clauses that terminate or limit a debtor's interests in its property upon the filing of a bankruptcy petition are invalid because they take assets from the debtor's estate. *See Id.* Fraudulent transfer savings clauses, however, take nothing from the debtor's estate. To the contrary, fraudulent transfer savings clauses actually provide value to the estate in the form of a reduction of the debtor's liability to the lender. Consequently, the Bankruptcy Court's invocation of §541(c)(1)(B) as a basis for invalidating the savings clauses is without merit.

### C.    The Savings Clauses are Not Inherently Indeterminate

Since both the First and Second Lien Loans contained savings clauses and were made at the same time, the Bankruptcy Court stated that it could not determine whether the First Lien Loan needed to be reduced, and by how much, without first determining whether the Second Lien Loan needed to be reduced, and by how much. The Bankruptcy Court then concluded that this interaction between the savings clauses in the two loans made the liabilities under the two term loans "*inherently* indeterminate" and unenforceable. (Findings, p. 141) (emphasis in original).

However, the effect of the savings clauses is readily determinable. The plain language of the savings clauses simply requires that the obligations of any Conveying Subsidiary be reduced to an amount that renders that entity solvent. After weeks of expert testimony, the Bankruptcy Court determined the fair value of the Conveying Subsidiaries' assets and liabilities, and therefore, the amount by which each entity was insolvent. Consequently, all that remained

was for the Bankruptcy Court to perform a simple *pro rata* allocation of that amount among the two Term Loans. Since both loans were entered into as part of one global transaction, both contributed simultaneously to each Conveying Subsidiaries insolvency. Reducing each in proportion to its contribution to each Conveying Subsidiary's insolvency would be equitable and would effectuate the reasonable expectations of the parties, and would be well within the province of the Bankruptcy Court. As the effect of the fraudulent transfer savings clauses is readily determinable, CFA respectfully requests that this Court overrule the Bankruptcy Court's ruling with regard to the enforceability of such clauses.

D.     **The Savings Clauses Automatically Amended the Conveying Subsidiaries' Obligations and No Written Modification Was Necessary**

The Term Loans provided that amendments to the Term Loan documents were only effective to the extent evidenced by a signed writing. Noting that the fraudulent transfer savings clauses purported to reduce the Conveying Subsidiaries' obligations under the Term Loans, the Bankruptcy Court found that such savings clauses never became effective, and therefore the obligations never were reduced, because the lenders did not execute a signed amendment explicitly reducing those obligations. Findings, p. 142-43. The Bankruptcy Court, however, ignored the fact that the savings clauses provide that the Borrowers' joint and several liability, and any liens securing that liability, "shall be deemed to have been ***automatically amended*** accordingly at all relevant times." Consequently, no signed amendment was necessary to reduce the obligations of the Borrowers as the savings clauses were self-executing by their terms.

III.     **Similar Savings Clauses Are Routinely Enforced**

Fraudulent transfer savings clauses emerged from a strong legal tradition of savings clauses that are widely recognized and upheld in various commercial contexts. Usury

{230053.0001/N0846292_1}

-11-

1605733.2

savings clauses, which limit the interest payable under a promissory note to the highest rate permitted by applicable law, have been upheld in a variety of circumstances in many jurisdictions. *See e.g.*, *In re Perry*, 425 B.R. 323, 376-77 (Bankr. S.D. Tex. 2010); ("[s]avings clauses are favored by the law and will be given effect if reasonably possible."); *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1057-58 (S.D. Fla. 1998) (imposition of overdraft fee was not usurious under Florida law due to the presence of usury savings clause in deposit agreement); *Jersey Palm-Gross, Inc. v. Paper*, 658 So.2d 531, 534 (Fla.1995) ("[S]avings clauses serve a legitimate function in commercial loan transactions and should be enforced in appropriate circumstances."); *In re Dominguez*, 995 F.2d 883, 886 (9th Cir. 1993) (under California law, loan extension agreement was not usurious where agreement contained saving clause that stated that interest would not exceed the highest rate permitted by law); *FDIC v. Claycomb*, 945 F.2d 853, 860 (5th Cir. 1991) (A court "must, if reasonably possible, give effect to [a] savings clause" and finding that the lender's demand for allegedly usurious interest was "automatically constricted within the bounds of the law by virtue of the savings clauses in the underlying documents thereby eliminating any contention that illegal interest was claimed.").

Courts have also acknowledged the validity of savings clauses where uncertainty in market conditions makes it difficult to predict what the legal effect of a transaction will be in the future. For example, In *In re Matter of King*, 545 F.2d 700, 705-06 (10th Cir. 1976), the court affirmed the district court's determination that a savings clause was effective to adjust the purchase price of certain stock. The trust agreements at issue included a provision which increased the purchase price of stock if the IRS ever found the fair market value to be greater than the value assigned under a distribution agreement. The goal of the provision was to avoid Gift Tax liability. Although the IRS argued that such a provision could not be given effect to

alter the terms of a completed transaction, the court disagreed, finding that the parties had intended to pay a full and adequate consideration for the stock but that uncertainty in the value made it difficult to determine the fair market value. *Id.* at 705. Thus, court's view savings clauses as efforts to provide flexibility in contracts, that allow the parties to address factual and legal uncertainty, and not as attempts to subvert the law.

Another well accepted and widely used savings clause is the contractual severability clause which seeks to preserve agreements that would otherwise be unenforceable because a single clause is found to be illegal or unenforceable. These clauses, which are found not only in loan agreements but in most commercial agreements of every kind, are routinely enforced. In *Krstic v. Princess Cruise Lines, Ltd.*, No. 09-23946-CIV, 2010 WL 1542083 (S.D. Fla. March 25, 2010) the court concluded that the choice-of-law clause in an employment agreement violated public policy. *Id.* at *5. However, because the agreement included a severability clause, the court was able to strike the choice-of-law clause and give effect to the balance of the agreement. *Id. See also*, *Anders v. Hometown Mortgage Serv.*, 346 F.3d 1024, 1031-32 (11th Cir. 2003) (In the context of a severability provision, the court has a duty to preserve so much of a contract as may properly survive its invalid and ineffective provisions); *Caban v. J.P. Morgan Chase Co.*, 606 F. Supp. 2d 1361, 1372 (S.D. Fla. 2009) (under Delaware law, a severability provision allowed an invalid class action waiver to be removed from an arbitration provision and thus the arbitration provision remained enforceable).

The inclusion of savings clauses are a standard practice among estate planners and a common and effective way to preserve wills and trusts when their designated transfers would otherwise violate the rule against perpetuities. *See Bank of America, N.A. v. Carpenter*, --

N.E.2d --, 2010 WL 2079651 (Ill. App. 1st Dist. May 24, 2010).[7]  In *White v. Fleet Bank of Maine*, 739 A.2d 373 (Me. 1999), a testamentary trust was challenged as void *ab initio* because its distribution provisions violated the rule against perpetuities.  *Id.* at 376.  The court concluded that a savings clause stating that the right to income would follow the lines of direct descent "as long as the Trust may be made to endure" save the trust from violating the common law rule.  *Id.* at 377.  Thus, the trust's distribution provisions remained valid except for those that would one day violate the rule against perpetuities.  *Id.*  The perpetuities savings clause preserved the remaining distributions and the settlor's testamentary purpose.[8]

Absent savings or severability clauses, courts also can reform contracts in order to conform with the law.  For instance, under the "blue pencil" rule in effect in many jurisdictions, courts are empowered to reform or amend restrictions in a non-compete clause if the original restrictions are overly broad or burdensome.  In *G & K Servs., Inc. v. Ambler*, No. 07-601, 2007 WL 712290 (E.D. Pa. Mar. 6, 2007), the court utilized its blue-penciling power to limit the scope of a non-compete provision in an employment contract which would otherwise have been overly broad and therefore unenforceable.  The non-compete clause had an extensive geographic scope that would have prevented the former employee from working in the industry virtually anywhere

---

[7] *See also, Cattail Assocs. Inc. v. Sass*, 907 A.2d 828, 840 (Md. App. 2006) ("Drafters have long used a 'savings clause' to avoid violations of the rule against perpetuities," and "[c]ourts generally find savings clauses to be effective in avoiding the rule.") (internal citations omitted);  *In re Hawley*, No. 02-83674, 2004 WL 330098 at *5 (Bankr. C.D. Ill. Feb. 20, 2004) (Savings clauses are often inserted by "cautious drafters as a hedge against any possible violation of the Rule Against Perpetuities.");  *Lilly v. Citizens Fidelity Bank and Trust Company*, 859 S.W.2d 666, 672 (Ky App. 1993) (The possibility of the invalidity of the provisions of a will or a trust under the rule against perpetuities is precisely why a testator uses a perpetuity savings clause).

[8] *See also, Smith v. Smith ex rel. Clarke*, 747 A.2d 85, 90 (Del. Ch. 1999) ("Consequently, if I can interpret language in the savings clause in a manner which allows the option to comply with the rule [against perpetuities], I must.");  *Ludwig v. AmSouth Bank of Florida*, 686 So.2d 1373, 1377 (Fla. App. 2d Dist. 1997) (upholding savings clause because it demonstrated settlors' intent to continue trusts for maximum period allowed under rule against perpetuities).

in the United States – a restriction that would have been void as a violation of public policy. *Id.* at *5. Through its blue-pencil powers, the court limited the geographic scope of the non-compete clause to the employer's eastern region, where the employee's expertise was focused. Thus, the court's power to excise the offending provision saved the remainder of the other-wise valid contract. *Id. See also, Kegel v. Tilloston*, 297 S.W.3d 908, 913-14 (Ky. App. 2009) (remanding for consideration of whether non-compete should be amended under blue pencil rule); *Zimmer, Inc. v. Sharpe*, 651 F. Supp. 2d 840, 843 (N.D. Ind. 2009) (under Indiana's blue pencil doctrine, unreasonable contractual provisions may be severed so that the reasonable portions may be enforced).

Furthermore, legislatures regularly insert severability clauses into statutes in order to preserve them if any portion is later found by a court to be invalid or unconstitutional. *See Dallman v. Ritter*, 225 P.3d 610, 638 (Colo. 2010) (a severability clause in legislation demonstrates the lawmaking body's intent that the law remain largely in force despite particular, limited infirmities); *People v. Kelly*, 222 P.3d 186, 213 (Cal. 2010) (the existence of a severability clause generally calls for sustaining the valid part of the legislation).

Far from trying to circumvent laws, each of the examples described above represents an attempt to achieve compliance with the law to the maximum permissible extent. Moreover, time and again, Courts have accepted the implicit request to reform a contract or statute in the interests of allowing its intent to be realized to the greatest extent possible. Fraudulent transfer savings clauses are consistent with this venerable and well-established tradition and should be treated no differently. Therefore, CFA respectfully requests that this Court overrule the Bankruptcy Court insofar as it found the fraudulent transfer savings clauses to be unenforceable.

## Conclusion

Unless reversed on appeal, the Bankruptcy Court's wholesale invalidation of fraudulent transfer savings clauses will adversely impact the availability and cost of credit for businesses – a result that unfairly penalizes parties that seek in good faith to comply with the provisions of the Code and state fraudulent transfer laws. As such, and because such ruling is not supported by the Bankruptcy Code or the historically favorable treatment afforded by courts to savings clauses, CFA respectfully requests that this Court reverse the decision of the Bankruptcy Court as it relates to the fraudulent transfer savings clauses.

Dated:  August 5, 2010

COMMERCIAL FINANCE ASSOCIATION

By  /s/Charles M. Tatelbaum
One of Its Attorneys

Charles M. Tatelbaum (FL Bar No. 177540)
Adorno & Yoss LLP
350 East Las Olas Blvd.
Suite 1700
Ft. Lauderdale, FL 33301
(954) 766-7820
(866) 621-4198 (facsimile)

Richard M. Kohn (IL Bar No. 1501070)
William C. Meyers (IL Bar No. 6195666)
Nury R. Agudo (IL Bar No. 6298956)
GOLDBERG KOHN LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000
(312) 332-2196

Jonathan N. Helfat (NY Bar No. JH (9484))
James M. Cretella (NY Bar No. JC (6978))
OTTERBOURG, STEINDLER, HOUSTON &
     ROSEN, P.C.
230 Park Avenue
New York, NY 10169
(212) 661-9100
(212) 682-6104 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on August 5, 2010 he electronically filed the foregoing document with the Clerk of Court using the CMF/ECF filing system. He also certifies that the foregoing document is being served this date on all counsel of record or pro se parties via transmission of Notices of Electronic Filing generated by the CM/ECF.

/s/Charles M. Tatelbaum